IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER L. GOSSAGE, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | Civil No. 14-cv-1231-JPG-CJP |

**MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff Jennifer L. Gossage seeks judicial review of the final agency decision denying her application for a closed period of Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for benefits in March 2012, alleging disability beginning on April 1, 2010. She later specified that she sought benefits for a closed period from April 1, 2010, through October 16, 2012. (Tr. 21). After holding an evidentiary hearing, ALJ Karen Sayon denied the application on December 17, 2013. (Tr. 21-33). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 6). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1.  The ALJ failed to properly consider whether Ms. Gossage was unable to sustain competitive work activity for any period of at least 12 months in light of the VE's

1

testimony that employers will tolerate only 10 to 14 days of absence per year.

2. The ALJ failed to properly weigh the opinion of plaintiff's treating physician and to explain why she rejected part of the opinions of the state agency reviewing physicians.

3. The ALJ failed to account for plaintiff's mental limitations in finding that she was able to perform her past relevant work.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in

2

past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the

3

scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Gossage was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996), citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Sayon followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity during the alleged closed period and that she was insured for DIB through December 31, 2015. She found that plaintiff had severe impairments of status post left rotator cuff tear; total left hip replacement due to degenerative arthritis with avascular necrosis; obesity; ulcerative colitis; lumbar degenerative disc disease; degenerative joint disease of both knees; and rheumatoid arthritis. She determined that these impairments do not meet or equal a listed impairment.

4

The ALJ found that Ms. Gossage had the residual functional capacity (RFC) to perform work at the light exertional level with a number of physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past relevant work as a front desk clerk and retail manager.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born in 1965, and was almost 45 years old on the alleged onset date. (Tr. 195). She was 5' 3" tall and weighed 201 pounds. (Tr. 198). She said she was terminated from her job on April 1, 2010, because she was unable to perform her job for eight hours a day. (Tr. 199). She completed one year of college in August 2011. (Tr. 199).

Plaintiff worked in the past as a manager of a gas station and of a retail store, a field manager/supervisor in a convenience store, a deli clerk and a data entry clerk. (Tr. 206).

In September 2012, plaintiff stated in a Function Report that her problems affected her back, hips and joints. She said she had difficulty lifting, bending, standing, reaching, walking, sitting, kneeling and climbing stairs. (Tr. 283).

**2. Evidentiary Hearing**

Ms. Gossage was represented by an attorney at the evidentiary hearing on November 25, 2013. (Tr. 41).

Plaintiff began working in the deli department at a Wal-Mart store in October 2012. (Tr. 47).

Ms. Gossage had a total left hip replacement in August 2010. She testified that, the surgery helped, but did not completely fix her problems. She still had pain in her hip and difficulty walking and standing. She had to take extra breaks at work. She also had pain in her back and knees. (Tr. 52-53). She had surgery on her left shoulder in December 2011. She still had no strength in her arm. (Tr. 55-56). In addition, she had "stomach problems." (Tr. 57).

Plaintiff was diagnosed with rheumatoid arthritis in 2010 by her orthopedic specialist. She has not seen a rheumatologist. (Tr. 60).

Plaintiff testified that she spent "quite a few days in the hospital" during the period at issue. She was in a nursing home for a while after her hip replacement. When she went home, she was in a wheelchair and then progressed to a walker for two or three weeks. Even after her shoulder surgery, she had swelling in her fingers and shoulder. Her hands went numb and she could not use them. (Tr. 61-63).

A vocational expert (VE) also testified. The ALJ asked the VE a series of hypothetical questions. One of the questions comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; occasional overhead reaching with the dominant left upper extremity; frequent fingering bilaterally; and occasional typing.

The VE testified that this person could perform plaintiff's past work as a front desk clerk and retail manager. However, if she were limited to occasional handling and fingering with the

6

left upper extremity, rather than frequent, she would not be able to do any of her past work, and there would be no light or sedentary jobs that she could perform.   (Tr. 68-70).

The VE testified that the "typical absenteeism" tolerated by employers is ten to fourteen days per year.   (Tr. 70).

### 3. Medical Treatment

Plaintiff developed an abscess on her left upper arm in March, 2010.   A doctor performed an incision and drainage on March 10, 2010, and plaintiff received wound care from physical therapy on a daily basis.   She continued to work.   She developed swelling and redness in her arm and hand.   She was diagnosed with a MRSA infection and was admitted to the hospital on April 6, 2010, for treatment with IV antibiotics.   She was also diagnosed with cellulitis in her left hand.   She was discharged on April 8, 2010.   (Tr. 497-510).   She continued to receive wound care from physical therapy through May 14, 2010.   On May 14, 2010, she was "fully healed."   She was seen one month later for follow-up and had no further problems.   (Tr. 383-395).

Ms. Gossage saw Dr. Earman, an orthopedic surgeon, on August 2, 2010, for worsening pain in her left hip.   The doctor recommended a hip replacement.   He ordered crutches and directed her to remain non-weightbearing.   (Tr. 673-674).   She was admitted to the hospital on August 18, 2010, for a total left hip replacement.   The admitting note indicates she had a history of advanced avascular necrosis.   She used crutches to walk.   She was 5'3" tall and weighed 200 pounds.   She was discharged from the hospital on August 22, 2010, after uneventful surgery. (Tr. 482-484).   Plaintiff was in an inpatient rehabilitation facility from August 23 to August 30, 2010.   (Tr. 671).

Dr. Earman saw plaintiff on October 11, 2010. She was improving but was still using one crutch. (Tr. 669). By December 20, 2010, she was doing "very well" with her hip replacement, but complained of pain in both shoulders, pain with overhead activities, and pain over her right hip. Dr. Earman diagnosed bursitis in the right hip and tendinitis in both shoulders. (Tr. 667-668).

In January 2011, Dr. Earman saw plaintiff in his office following an emergency room visit for low back pain. A CT scan showed a bulging disc at L4-5 causing moderate stenosis. (Tr. 665-666). Plaintiff attended physical therapy prescribed by Dr. Earman from February 9 through April 6, 2011. (Tr. 354-364). She attended a total of 18 visits. At discharge, she had met her goals of improving lumbar range of motion, increasing core strength and enabling ambulating for community distances. She still complained of pain which limited her activities of daily living at times. (Tr. 364).

On June 7, 2011, plaintiff's gallbladder was removed in an outpatient procedure. (Tr. 466-467). However, she was admitted to the hospital the next day because of a bile leak. A diagnostic laparoscopy was performed and a stent was placed. She was discharged on June 14, 2011, with the stent still in place. (Tr. 444-447). Ms. Gossage was readmitted to the hospital on August 5, 2011, for surgical removal of the stent. She was discharged on August 7, 2011. (Tr. 434-443).

Plaintiff continued to have abdominal pain, and she was readmitted to the hospital on August 20, 2011. The diagnosis was possible irritable bowel syndrome. She was discharged on August 23, 2011. (Tr. 423).

Plaintiff attended physical therapy for her left shoulder, prescribed by Dr. Earman, from October 12 through November 18, 2011. (Tr. 344-353). She attended a total of 12 sessions. She was discharged from therapy because she was going to have surgery on her shoulder. (Tr. 353).

Dr. Earman performed a left rotator cuff reconstruction, acromioplasty and decompression on December 7, 2011. Plaintiff was discharged from the hospital on December 9, 2011. (Tr. 414-418). She then attended 11 physical therapy sessions for her shoulder from February 10, 2012, through March 26, 2012. She was discharged due to insurance limitations. She had improved, but she still had some left shoulder pain as well as low back pain. She was using her arm for activities of daily living such as laundry, cleaning and driving. (Tr. 365-377).

In May 2012, plaintiff followed up with Dr. Earman. She said that her left shoulder did not feel right, and she had crepitus in the right shoulder and pain in the right hip. Dr. Earman changed her anti-inflammatory medication and noted that she might need a hip replacement on the right in the future. (Tr. 774-775).

Plaintiff went to the emergency room for abdominal pain on June 11, 2012. (Tr. 861-865). She again went to the emergency room for back pain and a urinary tract infection on July 21, 2012. (Tr. 762-770).

Plaintiff saw Dr. Earman for low back pain in August 2012. She had no numbness or parasthesias in her legs. X-rays showed degenerative changes in the low back. She was to continue taking Motrin and Ultram. (Tr. 772-773).

During the relevant time, Ms. Gossage's primary care physician was Dr. Sheldon Levine. Dr. Levine's office notes are located at Tr. 782-810. On July 19, 2010, he noted that plaintiff had

9

degenerative joint disease of the right hip and she was scheduled for a left hip replacement. She also had rheumatoid arthritis and ulcerative colitis. (Tr. 810). He saw plaintiff for a urinary tract infection in November 2010. (Tr. 803). In January 2011, Dr. Levine prescribed Vicodin for arthritis pain "all over." (Tr. 801). Later that same month, he prescribed Norco (hydrocodone and acetaminophen) for low back pain and recommended that she have an MRI of the lumbar spine. (Tr. 800). In February 2011, Dr. Levine noted that the MRI showed abnormal findings at L4-5 and stenosis at L2-3 and L3-4. Plaintiff was to see Dr. Earman. (Tr. 799). In March 2011, Dr. Levine noted that plaintiff's hand was swollen and she had pain in her wrists and shoulder. He stated that she had rheumatoid arthritis for 15 years. (Tr. 797). In January 2012, Dr. Levine refilled her prescription for Norco following her shoulder surgery. (Tr. 791). He refilled the prescription in March, April and May 2012. (Tr. 786-790). On September 27, 2012, Dr. Levine noted that he filled out a "form for public aid." She complained of pain in her hip and lumbar spine. (Tr. 782)

       4.       **Dr. Levine's Opinion**

Dr. Levine completed a report entitled "Arthritic Report" in May 2012. He gave a diagnosis of rheumatoid arthritis. She had a bilateral grip strength of 4/5. She had no significant limitations on doing repetitive reaching, handling or fingering on the right, but was limited on the left. She had a "slight amount" of difficulty in grasping, turning and twisting objects on the left. Ambulation was normal without an assistive device, but she could only walk for 2 blocks. She could sit or stand for 2 hours and needed to include periods of walking around during the work day. She needed to be able to shift positions at will. (Tr. 756-758).

Dr. Levine completed a form entitled "Medical Evaluation-Physician's Report" at the request of the Illinois Department of Human Services on September 27, 2012.  He listed her diagnosis as rheumatoid arthritis.   He said she had decreased range of motion of the lumbar spine on flexion.   He rated her as having up to 20% reduced capacity in a number of areas, including finger dexterity, sitting and walking.   She could lift no more than 10 pounds.   (Tr. 844-847).

5. **Agency Consultants' Opinions**

Acting as an agency consultant, Dr. Reynaldo Gotanco evaluated plaintiff's RFC based on a review of the records on June 27, 2012.   (Tr. 73-82).   Among other findings, he opined that plaintiff was limited to only occasional fine and gross manipulations with her left hand.   (Tr. 79).

A second agency consultant wrote a report concurring with Dr. Gotanco on November 1, 2012.   (Tr. 84094).   The second doctor also thought that plaintiff was limited to only occasional fine and gross manipulations with her left hand.   (Tr. 92).

## Analysis

Plaintiff's first point is well-taken and requires remand.

Plaintiff argues that, in view of the extensive medical treatment and rehabilitation she underwent in the period at issue, the ALJ failed to adequately consider whether she was unable to sustain competitive employment for any twelve month period.   During the period at issue (April 1, 2010 through October 16, 2012), Ms. Gossage was hospitalized for a total of 25 days and spent another 8 days in an inpatient rehabilitation facility.   Following her discharge from the rehabilitation facility, she was on non-weightbearing status for about 21 days, and she had to use one crutch to walk for about another 21 days.   In addition, she had substantial outpatient care.   She attended almost daily wound care sessions for over a month, and she attended a total of 41

11

physical therapy sessions for her back and shoulder. She also had a number of doctor's office and emergency room visits.[1]

The vocational expert testified that the typical employer will tolerate 10 to 14 days of absenteeism a year. (Tr. 70-71). While the ALJ summarized Ms. Gossage's rather extensive medical care during the period at issue, Tr. 26-30, she did not address the question of whether this treatment would have prevented plaintiff from maintaining competitive employment during this time. This was error.

The Commissioner counters plaintiff's argument by asserting that the ALJ "reasonably found that Plaintiff did not have an impairment that met the durational requirement set out in the regulations." Doc. 20, p. 4. She cites to Tr. 30-31 as support for this statement, but those pages of the ALJ's opinion do not address the durational requirement.

The Commissioner is correct in stating that, in order to be found to be disabled, plaintiff must have a medically determinable impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). See also, 20 C.F.R. §404.1509. She is incorrect, however, in stating that the ALJ found that plaintiff's impairments did not meet the 12 month durational requirement. In fact, she found the opposite.

At step 2 of the sequential analysis, the ALJ is required to determine "whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational

---

[1] Some of this care was related to plaintiff's gallbladder surgery and complications thereof. The ALJ did not find that her gallbladder problems constituted a severe impairment. However, even without the gallbladder treatment, the hospitalizations for her hip replacement and shoulder surgeries and the inpatient rehabilitation add up to 16 days. And, she was unable to bear weight for about 3 weeks after she was discharged from the rehabilitation facility.

requirement." *Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011). If the ALJ finds at step 2 that "you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled." 20 C.F.R. § 404.1520(a)(4)(ii).

Here, ALJ Sayon found that plaintiff had severe impairments of status post left rotator cuff tear; total left hip replacement due to degenerative arthritis with avascular necrosis; obesity; ulcerative colitis; lumbar degenerative disc disease; degenerative joint disease of both knees; and rheumatoid arthritis. (Tr. 23). If she had found that none of plaintiff's severe impairments met the durational requirement, she would have found plaintiff to be not entitled to a closed period of disability at step 2. She did not. She went on to perform the complete 5 step analysis.

Citing 20 C.F.R. §404.1522(a), the Commissioner also argues that unrelated impairments cannot be combined to meet the 12 month durational requirement. This is correct, but it is also true that the combined effect of *concurrent* impairments can be considered. §404.1522(b). Arguably, plaintiff's severe impairments were concurrent. More importantly, the Commissioner's argument is beside the point because, again, the ALJ's progression beyond step 2 of the sequential analysis indicates that she in fact found that plaintiff's severe impairments met the durational requirement.

The Commissioner's argument violates the *Chenery* doctrine. See, *SEC v. Chenery Corporation*, 63 S.Ct. 454 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). Not only does the argument here rely on grounds

13

that the agency did not embrace, it relies on grounds that are flatly contradicted by the agency's decision.  The Seventh Circuit has stated, "We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly." *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014), and cases cited therein.  This Court shares that concern.

This Court concludes that the ALJ erred in failing to consider whether, in view of the extent and nature of her medical treatment, plaintiff was able to sustain competitive employment during the period at issue.   That error requires remand for further proceedings.

The Court also agrees that the ALJ erred in her consideration of plaintiff's ability to handle and finger with her left hand during the alleged closed period.  This is a potentially dispositive issue, in view of the VE's testimony that, if plaintiff were limited to only occasional handling and fingering with her left (dominant) hand, she would be unable to do her past work or any other work at the sedentary or light exertional levels.   (Tr. 70).

The two state agency consultants who reviewed the record and assessed plaintiff's RFC concluded that she was limited to only occasional handling and fingering with the left hand.    (Tr. 79, 92).   The agency defines occasional as "occurring from very little up to one-third of the time."  Frequent is defined as "occurring from one-third to two-thirds of the time."   SSR 83-10, 1983 WL 31251, *5-6.   The forms that the consultants filled out defined the term frequent and occasional in the same way.   (Tr. 78, 90).

The ALJ stated that she assigned "great weight to these opinions as they proved well-supported by and consistent with the record evidence."   She went on to say that, on the

14

potentially dispositive issue of ability to handle and finger, she rejected their opinions because there were "very few abnormal findings and/or complaints related to her hands" and plaintiff "is now working at a job that requires frequent handling." She limited plaintiff to frequent, rather than occasional, fingering with both hands, and to only occasional typing. (Tr. 31).

There are three problems with this aspect of ALJ's decision. First, she did not adequately explain why the two state agency consultants' opinions were entitled to "great weight" in every respect except on the issue of plaintiff's ability to use her left hand. In effect, she overrode the doctors' opinion based on her lay opinion that there were not enough abnormal findings or complaints to warrant the restriction that the doctors recommended. This conclusion "amounts to the ALJ improperly 'playing doctor.'" *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), and cases cited therein. Secondly, plaintiff is seeking benefits for a closed period ending on October 16, 2012. The ALJ issued her decision on December 17, 2013. The fact that plaintiff was able to frequently handle more than a year after the end of the closed period is of very little relevance. Thirdly, it is difficult to understand how plaintiff could frequently finger but only occasionally type. "'Fingering' involves picking, pinching, or otherwise working primarily with the fingers." SSR 85-15, at *7. There was no evidence in the record to establish that the physical requirements of typing are materially different from fingering, and there was no evidence at all regarding plaintiff's ability to type. In short, the ALJ failed to build the requisite "logical bridge" from the evidence to her conclusion that plaintiff could frequently finger but only occasionally type. See, *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

In view of the disposition of plaintiff's first two points, it is not necessary to analyze her third point in any great detail.

RFC is "the most you can still do despite your limitations."  20 C.F.R. §1545(a).  In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record."  *Ibid*.  It suffices to note that, on remand, the ALJ should be mindful that the functional effects of both severe and nonsevere impairments are to be considered in assessing RFC.  20 C.F.R. §404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.")

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Gossage is entitled to social security disability benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves that issue to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jennifer L. Gossage's application for a closed period of social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATED:  5/11/2016

                                                *S/J. Phil Gilbert*
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**